UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Sandra J. Erenberg,                         Civil File No. 01-991 (MJD/JGL)

        Plaintiff,

v.                                          **MEMORANDUM AND ORDER**

Methodist Hospital,

        Defendant.

---

Christopher O. Obasi, Esq., Obasi Law Office for and on behalf of Plaintiff.

Penelope J. Phillips and Marnie E. Polhamus, Felhaber, Larson, Fenlon & Vogt, P.A. for and on behalf of Defendant.

---

This matter is before the Court on Defendant's Motion for Summary Judgment. In the underlying Complaint, Plaintiff alleges sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and age discrimination in violation of the ADEA. Plaintiff also alleges that her termination was in retaliation for raising claims of discrimination. For the reasons that follow, the Court grants Defendant's Motion.

**BACKGROUND**

Plaintiff Sandra Erenberg ("Erenberg") was employed by Defendant Methodist Hospital ("Methodist") as a health unit coordinator ("HUC") in the emergency department from August 10, 1998 until her employment was terminated on December 29, 1999. Erenberg was hired to work forty-eight hours per pay period, working eight-hour shifts and every other weekend. In the fall of 1999, Methodist hired two new health unit coordinators, Louisa Lorimer ("Lorimer") and Darcy Dolan, who were both much

younger than Erenberg. Erenberg's hours were changed to accommodate the newly hired coordinators. Erenberg claims that her change in schedule, and later her termination were a result of age discrimination and retaliation. Methodist claims that this was not the case.

JoAnn Brand ("Brand"), Erenberg's direct supervisor, informally talked to Erenberg twice regarding complaints she had received from nurses and other HUCs indicating Erenberg was eating at the triage desk and was rude to patients. While Erenberg concedes eating took place, and alleges it was customary, she denies being rude to patients. Beginning in October 1998, Erenberg was absent on a number of occasions due to her own illness. She notified Methodist in each instance. On one occasion Erenberg was two hours tardy for work because her car broke down. Employees at Methodist are expected to work at least 97% of their scheduled shifts. All absences are counted against an employee unless they result from an approved leave of absence such as FMLA or jury duty. In March of 1999, Erenberg received her first written warning for excessive absenteeism because she had exceeded the 3% absence rate.

In June of 1999, Erenberg received a second written warning regarding both her job performance and absenteeism. Specifically, the warning stated that physicians' orders were entered incorrectly, established procedures were not being followed resulting in patient delays, the telephone was being used for personal reasons, she had been rude to patients, she frequently consumed food at the triage desk, at times she did not follow directions given by the triage nurse, and she had been absent one time since the last written warning in March 1999. Erenberg disagreed with the warning and thought it was unfair, but she did not believe it was issued in a discriminatory manner. She explains that a physician's order which was entered incorrectly was entered by the X-ray department

after they notified her and told her that they would enter the lab tests directly into their own computer to expedite the result. Thus, Erenberg alleges she was not the person directly responsible for this particular incorrect entry. Erenberg also claims that any other computer errors were corrected immediately, causing no delay. Erenberg further disputes any allegations that she did not follow proper procedure.

In September of 1999, Methodist received fourteen complaints from within the department and three from outside the department within a two-week period regarding Erenberg's job performance. A number of the complaints centered around Erenberg's entering physician orders incorrectly, resulting in physician treatment and patient delay. Triage nurses complained that Erenberg did not follow proper procedures when patients presented themselves at the triage desk. They also complained about Erenberg's rude and inattentive behavior toward incoming patients and personal phone calls during work time. Complaints were also made about Erenberg's attendance, including tardiness, leaving work early without finishing her tasks, and taking extended breaks. Erenberg denied the allegations claiming she was not rude to patients, she received permission for her extended breaks, and other employees engaged in many of the same behaviors she did (i.e., leaving work early).

On the weekend of October 7 and 8, 1999, Erenberg alleges that another HUC, Tracy Archer ("Archer"), verbally attacked her in the triage area. Erenberg complained to Brand and the charge nurse about the incident. Erenberg met with Brand and Sher Stiles ("Stiles") and was told they would speak to Archer and follow-up with Erenberg. Stiles did talk to Archer about the incident, but did not follow-up with Erenberg. On October 18, 1999, Erenberg was given a written warning and was disciplined by being

given a three-day suspension. Erenberg was also required, as a condition of returning to work, to write a letter indicating her desire to continue in her employment.

Erenberg filed an internal grievance on October 28, 1999. She disputed the evaluation of her job performance and she alleged that she was verbally abused by several nurses, one emergency doctor, and one HUC. Brand, along with other employees, knew that certain employees called Erenberg "Malibu Barbie" at that time. Erenberg's grievance stated that she was also offended by Archer's flirtatious behavior, unprofessionalism and the sexual content of conversations in the workplace. Erenberg's grievance also complained of age discrimination because her hours were changed for a newly hired, younger HUC, and because she was subjected to comments about age, including "it was nice to be working with a younger person."

On October 28, 1999, Mark Nordby ("Nordby") met with Erenberg to address her concerns. Erenberg claimed that Archer engaged in inappropriate behavior which included flirting with the male technicians and doctors. She claimed that Archer gave back rubs to some of the men in the department and occasionally touched male employees on the shoulder, arm, or back. Erenberg further claimed that sexual jokes contributed to the uncomfortable environment. Nordby responded by confronting Archer about the issues, counseling her about her behavior, and writing a memorandum for Archer's personnel file. In addition, Nordby provided Archer with a copy of Methodist's policy on harassment and offensive behavior. Nordby also talked to Stiles and asked her to follow-up with the Archer situation.

Nordby looked into the issue of Erenberg's schedule change, and found that Stiles varied the schedules in compliance with department and hospital policy. Erenberg did

4

not personally see Archer engage in similar behavior following this counseling, but she alleges that she knew it was still occurring outside of her sight. Nordby followed-up on December 9, 1999, when he wrote Erenberg a letter explaining his actions.

Following her discussion with Nordby, Erenberg perceived no immediate follow-up with Archer, leading Erenberg to believe that Nordby had not taken action regarding her complaints. Acting on this perception, she talked first to Mr. LaPointe ("LaPointe"), vice-president of Human Resources, who told her that "if [she didn't] like it here, [she] should find another job." Erenberg then talked to Mr. David Wessner ("Wessner"), CEO, about her verbal and sexual harassment, retaliation, and hostile work environment. He agreed with the findings from her supervisors and mentioned that he conducts a sexual harassment seminar. Neither LaPointe nor Wessner did anything further.

In December of 1999, Methodist received two more written complaints from Erenberg's co-workers. Julie Underwood complained that Erenberg was not treating her with respect and was ordering her around. Lorimer complained that Erenberg was telling her she was condescending and "uppity." Stiles also received several complaints about Erenberg's behavior, and Erenberg continued to have an absenteeism rate above 3%. Erenberg was terminated from employment on December 29, 1999, at age 50.

Erenberg claims that her termination was the result of illegal retaliation for submitting complaints about Archer and that the termination was a violation of the ADEA, and Title VII. She claims that as a result of the hostile work environment, she became immensely ill and mentally depressed. Her depression was so severe that ordinary medication could not help her, and electrical shock therapy was prescribed.

Subsequently, Erenberg filed the underlying lawsuit. Methodist now moves for summary judgment.

**DISCUSSION**

**A.      Standard**

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. See Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik, 47 F.3d at 957.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. See Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designated to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327 (quotation omitted).

Three issues are before the Court on this summary judgment motion: (1) whether Defendant's conduct constitutes sexual harassment/hostile work environment; (2)

whether Defendant's conduct constitutes age discrimination; and (3) whether Defendant is liable for retaliatory discharge. The Court heard oral argument in the matter on October 4, 2002, and will address these issues in turn.

**B.    Sexual Harassment/Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court's examination of the evidence is guided by the three-part, burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Lee v. Minnesota, 157 F.3d 1130, 1133 (8th Cir. 1998) (citing Feges v. Perkins Rest., Inc., 483 N.W.2d 701, 710 (Minn. 1992)). The first prong requires the plaintiff to establish a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802. If the plaintiff meets this obligation, the burden shifts to the defendant to proffer a non-discriminatory explanation for its conduct. See id. If the defendant meets this burden, the prima facie presumption of discrimination disappears. The burden then reverts to the plaintiff to establish that the defendant's proffered legitimate reason was pretextual. See id. at 804.

To state a prima facie case of hostile work environment harassment, Plaintiff must show: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege or her employment; and (5) Defendant knew or should have known of the harassment and failed to take prompt action. See Caviness v. Nucor-

Yamato Steel Co., 105 F.3d 1216, 1222 (8th Cir. 1997); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993). Hostile work environment harassment occurs when the sexual conduct is sufficiently "sever or pervasive." Harris v. Forklift Sys, Inc., 510 U.S. 17, 20 (1993).

The conduct in question must be sufficient to create a hostile environment, both as it would be viewed objectively by a reasonable person, and actually viewed subjectively by the victim. See Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002). In determining whether conduct is sufficiently severe to alter the terms and conditions of a plaintiff's employment, the court must "look at all of the attendant circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Harris, 510 U.S. at 23.

It is undisputed that Erenberg is a member of a protected group. Viewing the facts in the light most favorable to Erenberg, she was also subjected to unwelcome harassment. This Court, however, concludes that the harassment was not based on sex.

An offensive workplace atmosphere does not amount to unlawful discrimination unless one gender is treated differently than the other. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). The fundamental issue is whether members of one sex are subjected to unfavorable conditions of employment that the members of the opposite sex are not. Id. Here, Erenberg cannot show that the conduct was directed at her because of her sex because she was not singled out on account of her gender; both male and female employees were subject to the same working environment. See, e.g., Palesch v. Missouri Comm'n on Civil Rights, 233 F.3d 560, 567 (8th Cir. 2000)

8

("[N]ot all unpleasant conduct creates a hostile work environment . . . plaintiff must show she was singled out because of her gender. . . .").

The Court concurs with Methodist's assertion that the alleged harassment was not so severe or pervasive as to alter a term, condition, or privilege of Erenberg's employment. See Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999). To clear the high threshold of actionable harm, Erenberg has to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21 (internal quotations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Oncale, 523 U.S. at 81 (internal quotation omitted). Thus, a hostile environment claim includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive. Harris, 510 U.S. at 21-22. These standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

The evidence presented illustrates that Erenberg was upset by Archer's actions, and by the name-calling; but, as a matter of law, she has failed to show that these occurrences in the aggregate were so severe and extreme that a reasonable person would find that the terms or conditions of Erenberg's employment had been altered. See Scusa, 181 F.3d at 967 (experiencing unpleasant conduct and rude comments does not equate to severe or pervasive harassment that altered conditions of employment). While a

9

reasonable person could conclude that hugs can sometimes constitute sexual harassment and can create a hostile environment, the hugs and touching here never applied directly to Erenberg. See Gentry v. Exp. Packaging Co., 238 F.3d 842, 850 (7th Cir. 2001). Further, referring to Erenberg as "Malibu Barbie" constitutes teasing and is an isolated comment that is insufficient to establish harassment. See, e.g., Scusa, 181 F.3d at 967 (holding teasing and offhand comments, even if offensive, are not actionable harassment). This Court concludes as a matter of law that Erenberg did not show a sexually harassing hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment. Erenberg's claim for a hostile work environment must fail. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

Even assuming this Court could find that the conduct was directed at Erenberg because of her sex, and assuming Erenberg had made a showing that the alleged harassment was so severe or pervasive as to alter a term, condition, or privilege of her employment, Erenberg's claim still fails because Methodist responded promptly and adequately to Erenberg's complaints. See Robinson v. Valmont Indus., 238 F.3d 1045, 1047 (8th Cir. 2001). An employer is not liable if it takes prompt remedial action which is reasonably calculated to end the harassment once the employer knew or should have known about the harassment. See Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999).

In analyzing the reasonableness of an employer's actions, "the court may consider the amount of time that elapsed between the notice of the harassment and the remedial measures taken, including any disciplinary action against the harasser or other options available to the employer such as employee training sessions." Stuart v. Gen. Motors

Corp., 217 F.3d 621, 633 (8th Cir. 2000). Erenberg asserts that because it took Methodist 5-6 weeks to follow-up with her about her complaints, Methodist only talked to Archer and gave her its harassment policy, and because Erenberg complained to Methodist's management and CEO without any follow-up, Methodist did not take actions that were reasonably calculated to end the harassment. This Court, however, believes Methodist's response to Erenberg's complaint was prompt and adequate.

Erenberg reported the alleged inappropriate behavior in the form of a grievance in October of 1999. Within days, Nordby met with Erenberg to discuss her concerns and an investigation ensued. Nordby started by speaking with Archer. Archer admitted the allegations against her. Nordby counseled Archer about her behavior and wrote a memorandum for Archer's personnel file. Erenberg testified that, after the disciplinary action, she did not see Archer engage in the complained of conduct. Further, Erenberg's claim that Methodist's actions with respect to the Malibu Barbie comment were not timely and appropriate must also fail because it is undisputed that Erenberg never told Nordby about the comment. Because Erenberg has offered no evidence to dispute the promptness or adequacy of Methodist's investigation and corrective action, summary judgment is appropriate. See Scusa, 181 F.3d at 968.

**C.   Age Discrimination**

Erenberg alleges that her schedule was changed, she was suspended, and later discharged because of her age. The age discrimination claim must also be analyzed under the three-part test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 309-10 (1996). In order for Plaintiff to establish a prima facie case of discriminatory discipline, Plaintiff

must establish that she "(1) is a member of the protected class; (2) was qualified for the position from which [s]he was demoted or discharged; and (3) was replaced by another person." Rothmeier v. Inv. Advisers, Inc., 932 F. Supp. 1156, 1159 (D. Minn. 1996) (citing McDonnell Douglas, 411 U.S. at 802).

Erenberg has not made a prima facie showing that she was qualified for the position from which she was discharged because she did not meet Methodist's legitimate performance expectations. See Richmond v. Univ. of Minn. Board of Regents, 957 F.2d 595, 598 (8th Cir. 1992) (noting protected age employee could not show she was qualified because of documentation that performance was unsatisfactory, she ignored progressive warnings and discipline and performance did not improve). Erenberg argues that Methodist never gave her a performance evaluation, so there was no way for her to know whether she was performing her job in a satisfactory manner.

The undisputed material facts establish that Erenberg was not performing the duties of HUC in a way that met Methodist's legitimate expectations. It is undisputed that Methodist identified deficiencies in Erenberg's performance throughout her employment and these deficiencies were communicated to her on a regular basis. Therefore, viewing the facts in a light most favorable to Erenberg, it is fair to infer that she did know that she was not performing her job in a satisfactory manner. In light of Erenberg's failure to establish that she was performing her job in accordance with Methodist's legitimate performance expectations. Accordingly, Defendant's Motion for Summary Judgment must be granted. See id.

Even assuming Erenberg had proven that she was performing her job in a satisfactory manner, in order to establish a prima facie case of discrimination, she must

do more than show that she is "a member of a protected class [and] the victim of an adverse employment decision." Matson v. Cargill, Inc., 618 F. Supp. 278, 281 (D. Minn. 1985). A causal connection between the age of the plaintiff and the adverse decision must be demonstrated. See id.; Zelewski v. Am. Fed. Sav. Bank, 811 F. Supp. 456, 462 (D. Minn. 1993). The plaintiff's "subjective beliefs and bare allegations" are insufficient to establish such a connection. Schibursky v. Int'l Bus. Machs. Corp., 820 F. Supp. 1169, 1176 (D. Minn. 1993).

Changing Erenberg's schedule was not an adverse employment action, but instead a mere inconvenience. See Ludwig v. Northwest Airlines, Inc., 98 F. Supp. 2d 1057, 1069 (D. Minn. 2000). A "mere inconvenience or unhappiness on the part of the employee will not lead to a finding of actionable adverse employment action." Id. Adverse employment action "is that which materially alters the terms or conditions of the plaintiff's employment." Id. Here, Erenberg's hours were altered consistent with Methodist's scheduling policy. Moreover, when Erenberg complained, Nordby investigated the scheduling to ensure that it was in compliance with the policy and determined that it was. Erenberg suffered no diminution in her title, salary or benefits, she had no complaints about her pay and she had not been transferred against her will. Erenberg has put forth no evidence to support a finding of an adverse employment action. See Scusa, 181 F.3d at 958. Further, there is no logical connection between making the scheduling changes and discharging Erenberg, and the hiring of the new employees. See O'Conner, 517 U.S. at 311 (stating there must be a "logical connection between each element of the prima facie case and the illegal discrimination").

Even assuming Erenberg satisfied her burden to make out a prima facie case, discrimination still cannot be found here. Once a plaintiff makes a prima facie showing, the burden shifts to defendant to "produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). Methodist met this burden by offering admissible evidence sufficient for the trier of fact to conclude that Erenberg was fired because of her numerous infractions and the flood of complaints. Erenberg's numerous infractions provide a legitimate non-discriminatory reason for her discipline.

Although intermediate evidentiary burdens shift back and forth under this framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." See St. Mary's Honor Ctr., 509 U.S. at 507-08. That is, the plaintiff may attempt to establish that she was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, St. Mary's Honor Center, 509 U.S. at 511, the trier of fact may still consider

14

evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." Burdine, 450 U.S. at 255 n. 10.

In attempting to prove that defendant's justification for her termination was pretextual, plaintiff must introduce evidence that establishes that her performance problems were not the real reasons for her suspension and discharge, and instead that unlawful discrimination or retaliation was the real reason. Roxas v. Presentation Coll., 90 F.3d 310, 316 (8th Cir. 1996). If plaintiff cannot produce sufficient evidence to create an inference of discriminatory motive, then defendant's articulated business reason remains unrebutted and summary judgment is appropriate. Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994).

In this case, Erenberg alleges that Methodist's reasoning was pretext because her schedule was changed to accommodate new hires, people at Methodist made negative comments about older people, and because others who acted similarly were not discharged. None of these reasons, however, actually prove that Methodist was motivated by a desire to discriminate.

Erenberg alleges that because only two employees over the age of forty were subject to schedule changes, the change is evidence of pretext. Erenberg's schedule change is insufficient to show pretext because at least a dozen employees left the department between August and December of 1999 due to schedule changes. Further, Ward, a co-worker of Erenberg's whose schedule was also affected, did not believe that age had anything to do with the schedule change.

Erenberg alleges that further evidence of pretext is found in two comments that were made in her presence. First, Erenberg alleges that sometime during her employment, she was having a conversation with Brand and mentioned Archer's flirtatious behavior to her. Erenberg claims that Brand's response was that "Archer is young and that's just the way they are." On another occasion, Erenberg alleges that a fellow HUC commented that "it is good to be working with a younger person." Erenberg did not report either of these comments.

Case law supports the notion that isolated comments that are remote in time and not related to the employment decision are insufficient to establish pretext for discrimination. See Weigel v. Baptist Hosp. of East Tenn., 302 F.3d 367, 379 (6th Cir. 2002) (noting reference to "old, ugly employees" not sufficient to establish pretext); see also Classe v. Whirlpool Corp., 35 Fed.Appx. 792, 794-95, 2002 WL 1023637, **2 (10th Cir. 2002) (noting derogatory, age-related comments that are isolated and unrelated to employment decision are insufficient to show pretext). Erenberg's allegations that the two comments are evidence of pretext do not have merit. Neither comment is specific to Erenberg, and the alleged comments are far removed from any employment decisions. As a matter of law, they are insufficient to show pretext for discrimination.

Erenberg's allegations that Methodist did not discipline other employees for similar infractions are also insufficient to prove pretext. Erenberg is correct in her assertion that a number of other employees have engaged in behavior similar to hers. However, Erenberg is incorrect in her assertion that those employees were not disciplined. Methodist uses a progressive discipline policy. Employees are disciplined based on the severity of the behavior, the frequency of the behavior, and the number of

disciplinary actions the employee has had previously. Both Brand and Stiles testified that other employees were disciplined for similar behavior. In this case, Erenberg was not disciplined or terminated because of one single infraction. She was disciplined, and ultimately discharged, because Methodist received numerous complaints against her regarding behaviors she had previously been asked to improve. Different disciplinary actions taken against different employees are insufficient, absent other evidence of pretext, to show that a plaintiff's discharge was the result of illegal discrimination. See Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1127 (8th Cir. 2000) (concluding plaintiff's belief that white teachers "were equally as failing" was insufficient to withstand summary judgment).

Even if Methodist was wrong or even unfair in its conclusion that Erenberg engaged in the behaviors she was accused of, that is not proof that Methodist's reason for terminating her employment was pretextual. See Beall v. Abbott Labs., 130 F.3d 614, 619-20 (4th Cir. 1997) (contending employer mistakenly assessed her performance is not enough). Erenberg cannot establish pretext simply by disputing, justifying or explaining her conduct. See Hutsen v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995). Furthermore, even if Methodist was wrong in believing Erenberg's conduct constituted rules violations, this does not "prove" that its explanation for discharging Erenberg is pretextual or unworthy of belief. Gill v. Reorganized Sch. Dist. R-6, 32 F.3d 376, 379 (8th Cir. 1994).

Based on the evidence presented, the Court concludes that Methodist's explanation for its employment decision was not pretextual. Accordingly, Defendant's Motion for Summary Judgment must be granted.

### D.     Retaliation

Like discrimination claims under Title VII, retaliation claims are analyzed under the McDonnell Douglas framework. See Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998). To establish a prima facie case of retaliation, Plaintiff must show that (1) she filed a charge of harassment or engaged in other protected activity; (2) her employer subsequently took an adverse employment action against her; and (3) the adverse action was causally linked to her protected activity. See Cross v. Cleaver, 142 F.3d 1059, 1071-72 (8th Cir. 1998); Manning v. Metro. Life Ins. Co., 127 F.3d 686, 692 (8th Cir. 1997). Here, Erenberg has failed to establish a prima facie case of retaliation because she failed to show a causal connection between the alleged hostile work environment and her termination. The decision to discharge was unrelated to any claim by Erenberg of harassment. The facts make it clear that Erenberg was discharged for performance deficiencies. Erenberg was disciplined for performance deficiencies well before she made any claims of a hostile work environment. Erenberg has not established a causal connection between her protected activity and her ultimate discharge.

Even assuming Erenberg made out a prima facie showing, summary judgment would still be appropriate because Methodist has articulated legitimate non-discriminatory reasons for its actions, which are precisely the reasons stated above invalidating Erenberg's age discrimination claim.

Furthermore, Erenberg has not offered any evidence to show that Methodist's reasons are actually pretext for retaliation. See McDonnell, 411 U.S. at 804. In other words, Erenberg has not introduced evidence that shows that her performance problems were not the real reasons for her suspension and discharge, and that retaliation was the

real reason. Following the analysis above repudiating Erenberg's allegation of pretextual age discrimination, the Court concludes that a reasonable jury could not find that Methodist's explanation for its employment decision was pretextual. Accordingly, Defendant's Motion for Summary Judgment must be granted.

**CONCLUSION**

Accordingly, based on all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. Defendant's motion for summary judgment on Plaintiff's claim for sexual harassment/hostile work environment against Methodist Hospital is **GRANTED**.

2. Defendant's motion for summary judgment on Plaintiff's claim for age discrimination against Methodist Hospital is **GRANTED**.

3. Defendant's motion for summary judgment on Plaintiff's claim for retaliation against Methodist Hospital is **GRANTED**.

Erenberg v. Methodist Hospital
Civ. No. 01-991

Dated: Jan. 3, 2003

Michael J. Davis
United States District Court Judge